UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| CEQUEL COMMUNICATIONS, LLC d/b/a SUDDENLINK COMMUNICATIONS, | Civil Action No.:  1:21-cv-05577 |
| Plaintiff, | |
| -against- | DEFENDANT'S ANSWER TO PLAINTIFF'S COMPLAINT AND COUNTERCLAIMS |
| MOX NETWORKS, LLC, | |
| Defendant. | |

Defendant, MOX Networks LLC (MOX") for its answer and affirmative defenses to Plaintiff Cequel Communications LLC d/b/a Suddenlink Communications' ("Plaintiff") Complaint and asserting counterclaims states as follows:

1.      Upon information and belief, MOX admits the allegations in Paragraph 1.

2.      MOX admits the allegations in Paragraph 2.

3.      MOX admits only that it entered into an agreement with Plaintiff entitled "Dark Fiber IRU and Construction Agreement" on or about September 26, 2017 (the "Agreement"). The Agreement is a writing that speaks for itself, and MOX refers the Court to the Agreement for a complete and accurate description of its terms.  MOX denies all characterizations of the Agreement that contradict its terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 3.

## FIRST CAUSE OF ACTION

4.      MOX incorporates its responses to the preceding paragraphs of the Complaint as if fully set forth herein.

5.      MOX admits only that it entered into IRU Network Order No. 1 ("Network Order No. 1") with Plaintiff on or about October 31, 2017.  Network Order No. 1 is a writing that speaks for itself, and MOX refers the Court to Network Order No. 1 for a complete and accurate description of its terms.  MOX denies all characterizations of Network Order No. 1 that contradict its terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 5.

6.      The Agreement and Network Order No. 1 are writings that speaks for themselves, and MOX refers the Court to the Agreement and Network Order No. 1 for a complete and accurate description of their terms.  MOX denies all characterizations of the Agreement and Network Order No. 1 that contradict their terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 6.

7.      MOX denies the allegations in Paragraph 7.

8.      MOX denies the allegations in Paragraph 8.

9.      MOX denies the allegation that it "accepted" the Fiber.  MOX admits only that more than forty-five (45) days have passed since it received Plaintiff's invoice for payment on Network Order No. 1, but MOX denies that any payment is due and owing to Plaintiff.  MOX denies the remaining allegations and characterizations contained in Paragraph 9.

10.     MOX denies the allegations in Paragraph 10.

11.     MOX denies the allegations in Paragraph 11 and specifically denies that Plaintiff is entitled to any relief sought in its First Cause of Action of the Complaint.

SECOND CAUSE OF ACTION

12.     MOX incorporates its responses to the preceding paragraphs of the Complaint as if fully set forth herein.

13.     MOX admits only that it entered into IRU Network Order No. 2 ("Network Order No. 2") with Plaintiff on or about October 31, 2017.  Network Order No. 2 is a writing that speaks for itself, and MOX refers the Court to Network Order No. 2 for a complete and accurate description of its terms.  MOX denies all characterizations of Network Order No. 2 that contradict its terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 13.

14.     The Agreement and Network Order No. 2 are writings that speaks for themselves, and MOX refers the Court to the Agreement and Network Order No. 2 for a complete and accurate description of their terms.  MOX denies all characterizations of the Agreement and Network Order No. 2 that contradict their terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 14.

15.     MOX denies the allegations in Paragraph 15.

16.     MOX denies the allegations in Paragraph 16.

17.     MOX denies the allegation that it "accepted" the Fiber.  MOX admits only that more than forty-five (45) days have passed since it received Plaintiff's invoice for payment on Network Order No. 2, but MOX denies that any payment is due and owing to Plaintiff.  MOX denies the remaining allegations and characterizations contained in Paragraph 17.

18.     MOX denies the allegations in Paragraph 18.

19.     MOX denies the allegations in Paragraph 19 and specifically denies that Plaintiff is entitled to any relief sought in its Second Cause of Action of the Complaint.

THIRD CAUSE OF ACTION

20.     MOX incorporates its responses to the preceding paragraphs of the Complaint as if fully set forth herein.

21.     MOX admits only that it entered into IRU Network Order No. 3 ("Network Order No. 3") with Plaintiff on or about October 31, 2017.  Network Order No. 3 is a writing that speaks for itself, and MOX refers the Court to Network Order No. 3 for a complete and accurate description of its terms.  MOX denies all characterizations of Network Order No. 3 that contradict its terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 21.

22.     The Agreement and Network Order No. 3 are writings that speaks for themselves, and MOX refers the Court to the Agreement and Network Order No. 3 for a complete and accurate description of their terms.  MOX denies all characterizations of the Agreement and Network Order No. 3 that contradict their terms.  To the extent a further response is required, MOX denies the allegations set forth in Paragraph 22.

23.     MOX denies the allegations in Paragraph 23.

24.     MOX denies the allegations in Paragraph 24.

25.     MOX denies the allegation that it "accepted" the Fiber.  MOX admits only that more than forty-five (45) days have passed since it received Plaintiff's invoice for payment on Network Order No. 3, but MOX denies that any payment is due and owing to Plaintiff.  MOX denies the remaining allegations and characterizations contained in Paragraph 25.

26.     MOX denies the allegations in Paragraph 26.

27.     MOX denies the allegations in Paragraph 27 and specifically denies that Plaintiff is entitled to any relief sought in its Third Cause of Action of the Complaint.

<u>FOURTH CAUSE OF ACTION</u>

28.     MOX incorporates its responses to the preceding paragraphs of the Complaint as if fully set forth herein.

29.     MOX denies the allegations in Paragraph 29.

30.     MOX lacks knowledge or information sufficient to form a belief as to the truth of the allegations contained therein and, therefore, denies the same.

31.     MOX denies the allegations in Paragraph 31.

32.     MOX denies the allegations of Paragraph 32 and specifically denies that Plaintiff is entitled to any relief sought in its Fourth Cause of Action of the Complaint.

## FIFTH CAUSE OF ACTION

33.     MOX incorporates by reference its responses to the preceding paragraphs of the Complaint as if fully set for the herein.

34.     MOX denies the allegations in Paragraph 34.

35.     MOX denies the allegations in Paragraph 35.

36.     MOX denies the allegations of Paragraph 36 and specifically denies that Plaintiff is entitled to any relief sought in its Fifth Cause of Action of the Complaint.

## PRAYER FOR RELIEF

In response to Plaintiff's "WHEREFORE" paragraph, including Sub-Paragraphs A-F, MOX denies that it is liable to Plaintiff, or that Plaintiff is otherwise entitled to the requested relief or any relief whatsoever.

## **AFFIRMATIVE DEFENSES**

## FIRST AFFIRMATIVE DEFENSE

The Complaint fails to state a claim upon which relief can be granted.

## SECOND AFFIRMATIVE DEFENSE

If Plaintiff has sustained any injuries or damages, such were the result of Plaintiff's own actions and/or other intervening or superseding events, factors, occurrences or conditions, which were in no way caused by MOX and for which MOX is not liable.

## THIRD AFFIRMATIVE DEFENSE

No payment is due to Plaintiff under the Agreement because Plaintiff never delivered the Certified Results package to MOX, and MOX therefore never accepted the results, which is a prerequisite to payment becoming due.

## FOURTH AFFIRMATIVE DEFENSE

No payment is due to Plaintiff under the Agreement because MOX properly disputed the invoice amounts pursuant to the terms of the Agreement, Section 4(c).

## FIFTH AFFIRMATIVE DEFENSE

No payment is due to Plaintiff under the Agreement because of, among other things, Plaintiff's delay in performing its obligations under the Agreement and its material breaches.

## SIXTH AFFIRMATIVE DEFENSE

MOX acted reasonably and in good faith at all material times based on all relevant facts and circumstances known by it at the time it so acted.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by Plaintiff's failure to mitigate any damages allegedly sustained.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred, in whole or in part, by the doctrines of accord and satisfaction, estoppel, waiver, and unclean hands.

## NINTH AFFIRMATIVE DEFENSE

Plaintiff's alleged injuries and damages, if any, were caused by the acts or omissions of Plaintiff, or by the fault of Plaintiff, and its admissions, amendments, agreements, or waiver, and thus any recovery might be reduced accordingly or eliminated altogether in accord with applicable statutes and common law.

## TENTH AFFIRMATIVE DEFENSE

Plaintiff's claims for compensatory damages, interest, costs, and disbursements are barred or reduced by applicable law or statute.

## ELEVENTH AFFIRMATIVE DEFENSE

No act by MOX was a breach of any contract between MOX and Plaintiff.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiff's claims are barred by the limitations and defenses set out in the applicable statutes and common law, including any applicable contract defenses.  MOX incorporates by reference all defenses and/or limitations set forth or referenced in applicable statutes and common law.

## DEFENSES RESERVED

MOX will also rely upon any other defenses that may become available or apparent during discovery and reserves its right to assert any such defenses.

## COUNTERCLAIMS

Defendant/Counterclaim Plaintiff MOX Networks LLC ("MOX"), for its Counterclaim against Counterclaim Defendant Cequel Communications LLC d/b/a Suddenlink Communications ("Cequel" or "Counterclaim Defendant") (together with MOX, the "Parties"), states and alleges as follows:

## PARTIES

1.      MOX is a Delaware limited liability company located at 2040 E. Mariposa Avenue, El Segundo, California 90245.  MOX has ten LLC members, listed below.  For purposes of this Court's diversity jurisdiction, MOX is a citizen of California, Illinois, Florida, Virginia, Massachusetts, Ohio, and Washington.  *See Bayerische Landesbank, New York Branch v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 49 (2d Cir. 2012) (stating that for purposes of diversity jurisdiction, an LLC is a citizen of all the states in which its members are citizens).

   a.      NantWorks, LLC is a member of MOX.  The sole member of Nantworks, LLC is California Capital Equity, LLC.  The sole member of California Capital Equity, LLC is an individual who is domiciled in California and is therefore a citizen of that state.

   b.      MOX has nine other individual members.  Two of those members are domiciled in California, two others are domiciled in Virginia, and the other five members are domiciled in Illinois, Florida, Massachusetts, Ohio, and Washington.  The individual members are therefore citizens of those states.

2.      Cequel is a Delaware limited liability company located at 1111 Stewart Avenue, Bethpage, New York, 11714.  Public records for Cequel indicate that it is a Delaware limited liability company and CSC Holdings LLC is the sole LLC member.  CSC Holdings, LLC is a

limited liability company whose sole member is Cablevision Systems Corporation.  Cablevision

Systems Corporation is incorporated under the laws of Delaware and maintains its principal

place of business at One Court Square, Long Island City, New York, 11101.  Cequel is therefore

a citizen of Delaware and New York within the meaning of 28 U.S.C. § 1332.  *See Bayerische*

*Landesbank, New York Branch*, 692 F.3d at 49; *see also* 28 U.S.C. § 1332(c)(1) ("A corporation

shall be deemed to be a citizen of any State by which it has been incorporated and of the State

where it has its principal place of business.").

## JURISDICTION AND VENUE

3.      The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.

§ 1332 because the parties are citizens of different states and the amount in controversy exceeds

$75,000, exclusive of interest and costs.  The Court also has jurisdiction over MOX's

counterclaims against Counterclaim Defendant pursuant to 28 U.S.C. § 1367 because the

counterclaims arise out of the same transactions and events that give rise to Plaintiff's claims

against MOX.

## FACTS

4.      On September 26, 2017, MOX entered into the Dark Fiber IRU and Construction

Agreement (the "Agreement") with Cequel in which Cequel agreed to install and connect fiber

optic cables ("Grantee Fiber")[1] along segments of various, specific fiber routes, using fiber and

other materials supplied by MOX, pursuant to the terms of the Agreement.

5.      Pursuant to the Agreement, the Parties entered into three IRU Network Orders

(each individually referred to as a "Network Order") dated October 31, 2017 under which Cequel

---

[1] As defined in the Agreement, MOX is the "Grantee" and Cequel is the "Grantor."

9

agreed to install and connect the Grantee Fiber along certain routes specified in each Network

Order (individually, a "Route").

6.      The Agreement requires Cequel to ensure that the Grantee Fiber "is installed,

fully operational, and performs in accordance with (i) the specifications listed in Exhibit C (Fiber

Splicing and Testing Standards, Specifications and Procedures); and (ii) the terms of the

applicable IRU Network Order.  (Agreement, Ex. B ¶ 2.)  Cequel did not comply with this

provision of the Agreement.

7.      MOX provided Cequel with the proper Grantee Fiber that passed all required

factory test requirements prior to being turned over to Cequel for installation.

8.       At the time MOX provided the Grantee Fiber to Cequel, Cequel expressly

approved the Grantee Fiber, acknowledging that it was in an acceptable condition for

installation.

9.      Despite passing all required pre-installation testing, and being expressly approved

by Cequel, MOX discovered after Cequel's installation that significant portions of the Grantee

Fiber in the Fiber System were damaged and in need of repair and/or replacement.

10.     The damage to the Grantee Fiber, and in turn to the Fiber System, was caused by

Cequel's substandard, faulty, and improper handling and installation of the Grantee Fiber.

Among other things, Cequel damaged the Grantee Fiber by pulling it too tightly, contorting it

improperly, and using inordinate numbers of splices along each Route.

11.     Following installation, MOX had numerous communications notifying Cequel of

the defects in the Fiber System and of Cequel's ongoing contract violations.  MOX requested in

writing on multiple occasions that Cequel remedy the problems with the Grantee Fiber and Fiber

System, but Cequel failed to do so.  Cequel further failed to conduct an investigation into the

issues or make adjustments to the outstanding invoice amounts in violation of Section 4(c) of the Agreement.

12.    The individuals who installed the Fiber System in accordance with Cequel's obligations under the Agreement were not properly skilled or trained to appropriately install the Fiber System.

13.    Cequel's handling and installation of the Grantee Fiber was not done in accordance with proper industry standards for a number of reasons including that Grantee Fiber was pulled and contorted in an improper manner and there were an inordinate number of splice points along the Routes, which far exceeded what was permitted pursuant to Exhibits B and C of the Agreement and standard industry practices.  This has caused and will continue to cause connectivity issues and network disruptions along the Routes and have significantly reduced the expected lifespan of the Fiber System as a whole.

14.    Cequel compromised the integrity of the Grantee Fiber installation by mishandling the Grantee Fiber and making excessive splices in order to make installation easier.

15.    As a result of Cequel's substandard, faulty, and improper Grantee Fiber handling, installation, and splicing practices, MOX will need to replace significant portions of the Grantee Fiber in the Fiber System.

16.    Cequel's substandard, faulty, and improper Grantee Fiber handling, installation, and splicing practices are in contravention of the Specifications in Exhibit C of the Agreement.

17.    As a result of, among other things, Cequel's substandard, faulty, and improper handling, installation, and splicing practices, the Grantee Fiber was severely damaged during the installation process causing connectivity and network disruption issues throughout the Fiber System.

11

18.     Furthermore, Cequel's substandard, faulty, and improper handling, installation, and splicing practices were caused, at least in part, by Cequel's failure to have inspectors in the field monitoring daily installation activities and workmanship.  Such oversight is standard industry practice.

19.     Cequel was also required under each Network Order to complete construction by the Committed Delivery Date.  (*See, e.g.*, Network Order No. 1, ¶ 11.)

20.     Cequel did not complete construction on any Network Order by the Committed Delivery Date for a number of reasons including its substandard, faulty, and improper handling, installation, and splicing practices.  To date, the substantial portions of Grantee Fiber on all three Network Order Routes have never been properly installed and remain in disrepair and noncompliant with the required Specifications set forth in the Agreement.

21.     As a result, the Fiber System project is more than two and a half years behind schedule.  This delay has negatively impacted functionality of the Fiber System, required extensive remedial measures, delayed delivery of the Fiber System, and caused MOX to suffer considerable damages.

22.     Cequel further failed to timely deliver the Certified Results package to MOX in accordance with the Agreement.

23.     In order to ensure that Cequel properly installed the Grantee Fiber in the required timeframe and in accordance with the Specifications, the Agreement sets forth the terms for acceptance.  First, following the installation of the Grantee Fiber, Cequel was required to complete Acceptance Testing in accordance with the following terms:  Cequel must "conduct and complete" testing of the installed fiber and "furnish actual results of such completed testing" to MOX. (Ex. B, ¶ 1.)

24.     When Acceptance Testing was completed, Cequel was then required to present MOX with "the Deliverables and a fiber acceptance package of certified results (collectively, the "Certified Results") . . . certifying that the Grantee Fiber is installed, fully operational, and performs in accordance with (i) the specifications listed in Exhibit C (Fiber Splicing and Testing Standards, Specifications and Procedures); and (ii) the terms of the applicable IRU Network Order; (collectively, the "Specifications")."[2]

25.     Cequel never presented MOX with a final Certified Results package—inclusive of the Deliverables and a fiber acceptance package of certified results—"for an entire Route as ordered in the applicable Network Order" for any of the three routes specified in Network Orders Nos. 1-3.

26.     As a result of its failure to deliver the Certified Results package, there was no Acceptance of the Grantee Fiber as required by the Agreement.

27.     Exhibit B describes the three events that can trigger the Acceptance Date: the earliest date on which MOX "(i) provides written notice of its acceptance of the Grantee Fibers; (ii) fails to reject the Certified Results within the Evaluation Period; or (iii) uses the Grantee Fibers for purposes other than the Acceptance Testing, the Certified Results shall be deemed accepted by Grantee and Grantor shall have no further liability to Grantee related to Acceptance Testing ("Acceptance Date")." (Ex. B, ¶ 4.).  None of the triggering events have occurred.

28.     Because the Acceptance Date did not occur by the Committed Delivery Date, the Network Order fees are to be reduced by 5% for every 30-day period for which the Acceptance Date extends beyond the Committed Delivery Date.  (*See, e.g.*, NO1, ¶ 11.)  Those 5% reductions have substantially reduced or eliminated any claimed receivable.

---

[2] The term "Deliverables," means "the documentation regarding the as-built condition of the Grantee Fibers at the time the Certified Results are furnished to Grantee. . . ." (Agreement Definitions, subsection (s).)

29.     Failure to deliver the Certified Results within ninety (90) days of the Committed Delivery Date gives MOX the right to terminate the applicable Network Orders.  (*See* Agreement, § 5(b).)

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Breach of Contract)

30.     MOX restates and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

31.     MOX and Cequel entered into the Agreement dated September 26, 2017.

32.     MOX and Cequel entered into three Network Orders for three individual Routes on October 31, 2017.  Cequel was required to complete construction of each Network Order by the Committed Delivery Date.

33.     The Agreement and the Network Orders are valid and enforceable contracts.

34.     MOX fully performed its obligations under the Agreement and Network Orders including by providing Cequel with fully functional and factory test-approved Grantee Fiber that Cequel expressly approved prior to installation.

35.      As described above, Cequel materially breached its obligations under the Agreement and Network Orders by, among other things, using unqualified and untrained installation technicians, engaging in substandard, faulty, and improper handling, installation, and splicing practices, and failing to complete construction of the Network Orders by the Committed Delivery Date.

36.     As a direct and proximate result of Counterclaim Defendant's material breaches, MOX will have to repair and/or replace significant portions of the Fiber System.

14

37.     As a direct and proximate result of Counterclaim Defendant's material breaches, MOX has suffered, and will continue to suffer, monetary damages in an amount to be determined at trial but believed to be in excess of 1,000,000.00.

## SECOND CAUSE OF ACTION

### (Breach of the Maintenance Warranty)

38.     MOX restates and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

39.     The Agreement is a valid and enforceable contract.

40.     MOX fully performed its obligations under the Agreement including by providing Cequel with fully functional and factory test-approved Grantee Fiber that Cequel expressly approved prior to installation.

41.     Cequel's improper installation and splicing practices further constitute a breach of the Maintenance Warranty, in which Cequel warranted that it would construct and maintain the Grantee Fiber "in compliance with all applicable laws and regulations and in accordance with Prudent Industry standards."  (Agreement, § 8(a).)

42.     Cequel also breached the Maintenance Warranty by failing to have inspectors in the field monitoring daily installation activities and workmanship.

43.     As a direct and proximate result of Counterclaim Defendant's material breaches, MOX will have to repair and/or replace significant portions of the Fiber System.

44.     As a direct and proximate result of Counterclaim Defendant's material breaches, MOX has suffered, and will continue to suffer, enormous monetary damages in an amount to be determined at trial but believed to be in excess of 1,000,000.00.

## THIRD CAUSE OF ACTION

**(Breach of the Common Law Implied Covenant of Good Faith and Fair Dealing)**

45.     MOX restates and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

46.     The Agreement is a valid and enforceable contract.

47.     MOX fully performed its obligations under the Agreement including by providing Cequel with fully functional and factory test-approved Grantee Fiber that Cequel expressly approved prior to installation.

48.     Implicit in every contract is each party's covenant of good faith and fair dealing in the course of performance which obligates the parties to act in good faith, to use their best efforts to deal fairly with one another, and to do nothing that will impede the other from obtaining the benefits of the contract.

49.     By its aforementioned conduct, including, among other things, engaging in improper installation and splicing practices which ultimately damaged the Grantee Fiber causing connectivity issues and network disruptions, Cequel acted with bad motive and intention and materially breached the covenant of good faith and fair dealing.

50.     Cequel has wrongfully deprived, impaired, destroyed, and injured the rights of MOX to receive the value, benefit, and fruits of the Agreement.

51.     By reason of Counterclaim Defendant's breach of the covenant of good faith and fair dealing, Counterclaim Defendant unfairly frustrated the agreed common purpose of the Agreement.

52.     As a direct and proximate result of Counterclaim Defendant's actions, MOX has suffered, and will continue to suffer, enormous monetary damages in an amount to be determined at trial but believed to be in excess of 1,000,000.00.

## FOURTH CAUSE OF ACTION

### (Negligence)

53.     MOX restates and realleges the allegations set forth in the preceding paragraphs as if fully set forth herein.

54.     Cequel had a duty to properly care for and install the Grantee Fiber into the Fiber System.

55.     Cequel breached that duty using unqualified and untrained installation technicians, engaging in substandard, faulty, and improper handling, installation, and splicing practices in contravention of Exhibits B and C of the Agreement.

56.     Cequel further breached that duty by failing to have inspectors in the field monitoring daily installation activities and workmanship in accordance with the Maintenance Warranty and standard industry practice, causing severe damage to the Grantee Fiber in the Fiber System.

57.     As a direct and proximate result of Counterclaim Defendant's actions, MOX has suffered, and will continue to suffer, enormous monetary damages in an amount to be determined at trial but believed to be in excess of 1,000,000.00.

## REQUEST FOR RELIEF

WHEREFORE, MOX demands judgment against Counterclaim Defendant providing the following relief:

A.      An award of monetary damages resulting from the need to repair and replace portions of the Fiber System, which is in excess of $1,000,000.00;

B.      An award of all costs and expenses, including attorneys' fees, recoverable under the Agreement and applicable law; and

C.      An award of such further relief as the Court deems just, proper, and equitable.

## DEMAND FOR A JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, MOX hereby demands a trial by jury as to all issues related to its Counterclaims against Counterclaim Defendant.

Dated: July 2, 2021

*/s/ Andrew B. Joseph*
Andrew B. Joseph
**FAEGRE DRINKER BIDDLE &**
**REATH LLP**
1177 Avenue of the Americas, 41st Floor
New York, New York 10036
Telephone: (212) 248-3140
Facsimile: (212) 248-3141
Andrew.Joseph@faegredrinker.com
*Attorneys for Defendant MOX Networks,*
*LLC*