UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------X
CEQUEL COMMUNICATIONS, LLC,
doing business as Suddenlink
Communications,

     Plaintiff,

        - against –

MOX NETWORKS, LLC,

     Defendant.

------------------------------X

**MEMORANDUM AND ORDER**

21 Civ. 5577 (NRB)

**NAOMI REICE BUCHWALD**
**UNITED STATES DISTRICT JUDGE**

     This case arises out of a contractual relationship between Cequel Communications ("plaintiff"), a telecommunications company, and Mox Networks, LLC ("defendant"), a fiber optic service provider.  In October 2017, plaintiff agreed to construct a fiber optic network and grant defendant an indefeasible right of use ("IRU") for exclusive access and use of certain fibers on the route (the "Grantee Fiber") in exchange for the payment of so-called "IRU Fees."  Under the parties' agreement, plaintiff was entitled to invoice defendant for a majority of the IRU Fees on the "Acceptance Date."  The agreement provides three alternative ways to trigger the Acceptance Date, including, as relevant here, when defendant uses the Grantee Fiber for purposes other than preliminary testing of the fiber.

In March 2020, before the fiber testing was completed, defendant began using the Grantee Fiber for commercial purposes, namely, by licensing and delivering use of the fibers to its customer Comcast. As a result, on April 23, 2020, plaintiff sent defendant an invoice for $4,825,822.85, which represented the remaining balance of the IRU Fees. Defendant subsequently disputed the invoice and has not paid any portion of it since.

Plaintiff brought this case on April 7, 2021, seeking the full amount of the unpaid invoice. Defendant, in turn, filed several counterclaims against plaintiff. After a lengthy discovery process, both parties moved for partial summary judgment. Specifically, plaintiff moved for summary judgment on three of its breach of contract claims, and defendant cross-moved for summary judgment on a question of pure contract interpretation. For the reasons set forth below, plaintiff's motion for summary judgment is granted, and defendant's cross-motion is denied.

## BACKGROUND

The following facts are undisputed, unless otherwise noted.[1] They are drawn from (1) plaintiff's Local Civil Rule 56.1 statement

---

[1] Pursuant to Local Civil Rule 56.1, the Court treats as admitted the facts set forth in the Rule 56.1 statements unless "specifically denied and controverted by a correspondingly numbered paragraph in the statement required to be served

("Pl. 56.1"), ECF No. 66; (2) defendant's Local Civil Rule 56.1 counterstatement ("Def. Counter 56.1"), ECF No. 80; (3) defendant's Local Civil Rule 56.1 statement ("Def. 56.1"), ECF No. 79; (4) plaintiff's Local Civil Rule 56.1 counterstatement ("Pl. Counter 56.1"), ECF No. 83; and (5) admissible materials submitted by the parties in connection with the present motions.[2]  See ECF Nos. 68, 81.  For purposes of clarity, the Court cites only plaintiff's Rule 56.1 statement when the facts are not in dispute.

## A.  Factual Background

### 1. The Parties

Plaintiff is a subsidiary of publicly traded Altice USA, one of the largest telecommunication companies in the United States. Pl. 56.1 ¶ 1.  Defendant is a private fiber optic service provider. Id. ¶ 2.  The parties agree that they are both "sophisticated" companies in their own right, plaintiff in telecommunications and defendant in fiber optics.  Pl. 56.1 ¶ 3; Def. Counter 56.1 ¶ 3.

---

by the opposing party."  Local Civil Rule 56.1(c).  In addition, "[e]ach statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to evidence that would be admissible."  Local Civil Rule 56.1(d).

[2] All references to "Ex." are to exhibits appended to the Declaration of Avni P. Patel submitted in support of plaintiff's motion for summary judgment.  ECF No. 68.  References to "Def. Ex." refer to the exhibits attached to the Declaration of Marsha J. Indych, submitted in support of defendant's cross motion for partial summary judgment and in opposition to plaintiff's motion for summary judgment.  ECF No. 81.

**2. The Agreement**

On October 31, 2017, the parties executed a Dark Fiber IRU and Construction Agreement (the "Agreement"). Pl. 56.1 ¶ 4. Under the Agreement, plaintiff agreed to build a new fiber optic route using defendant's optical cable and grant defendant an IRU for exclusive access and use of certain fibers (i.e., the Grantee Fiber) for a term of twenty years (the "IRU Term") in exchange for the payment of IRU Fees. Id. ¶ 5; see also Ex. 1 ("Agmt.") at 1, §§ (mm), 2(a), 3. In tandem with the Agreement, the parties entered into three separate IRU Network Orders (each, a "Network Order" and collectively, the "Network Orders"), which are the purchase orders for the IRUs for specified strands in the Grantee Fiber. Pl. 56.1 ¶ 6; See Exs. 2-4.[3] Together, the IRUs cover fibers along a continuous 250-mile route from Ashland, Kentucky to Newport, Virginia (the "Route"). Pl. 56.1 ¶¶ 7-8. Of particular relevance here, the Agreement sets forth specific procedures for both accepting the Grantee Fibers and disputing any invoices.

**a. Acceptance Procedures**

The Network Orders each contain the specific IRU Fees that defendant must pay in exchange for the IRUs. E.g., Network Order

---

[3] IRU Network Orders Nos. 1, 2, and 3 are Exhibits 2, 3, and 4, respectively.

No. 1 § V(2).  While 25 percent of the IRU Fees was to be invoiced upon the commencement of construction, the remaining 75 percent was to be "invoiced" by plaintiff "upon [the] Acceptance Date." Id.  The Acceptance Date is defined by Exhibit B of the Agreement. See Agmt. § (a).  That exhibit, which is titled "Fiber Acceptance Procedures," contains five numbered sections that are at the heart of this dispute.  See id., Ex. B.

First, Section 1 of Exhibit B ("Acceptance Testing"), provides that "[f]ollowing the installation of the Grantee Fiber, [plaintiff] shall conduct and complete testing in the presence of [defendant] and furnish the actual results of such testing to [defendant] ('Acceptance Testing') in accordance with the procedures herein."  Id. § 1.

Second, Section 2 of Exhibit B ("Certified Results and Deliverables") states that "[u]pon the completion of the fiber testing and preparation of the Premises as necessary for delivery of the Grantee Fiber, [plaintiff] will present to [defendant] the Deliverables and a fiber acceptance package of certified results (collectively the 'Certified Results') . . . certifying that the Grantee Fiber is installed, fully operational, and performs in accordance with [the Agreement's specifications]."  Id. § 2.

Third, Section 3 of Exhibit B ("Evaluation Period") provides, in relevant part, that defendant will have 60 days "from its receipt of [the] Certified Results to review" them "and provide Acceptance" of the Grantee Fiber.  Id. § 3.  If defendant "determines that any of the Grantee Fibers" do not comply with the requisite specifications, defendant "will notify [plaintiff] that such results are unacceptable and specify in reasonable detail the non-compliance with the Specifications."  Id.  Plaintiff will then "complete corrective action as quickly as possible . . . to bring the installation and operating standards of such Grantee Fibers up to full compliance with the Specifications" and conduct "a new round of Acceptance Testing."  Id.

Fourth, Section 4 of Exhibit B, which is titled "Acceptance Date," indeed defines the term Acceptance Date.  See id. § 4.  It provides, in full:

> On the earliest date that [defendant]: (i) provides written notice of its acceptance of the Grantee Fibers; (ii) fails to reject the Certified Results within the Evaluation Period; or (iii) uses the Grantee Fibers for purposes other than the Acceptance Testing, the Certified Results shall be deemed accepted by [defendant] and [plaintiff] shall have no further liability to [defendant] related to Acceptance Testing ("Acceptance Date").  However, no acceptance or deemed acceptance will constitute a waiver by [defendant] of [plaintiff's] obligations of maintenance and repair of the Grantee Fibers.

Id.  The Acceptance Date triggers, among other things, plaintiff's right to invoice defendant for the remaining IRU Fees.  Pl. 56.1 ¶ 26.

Finally, Section 5 of Exhibit B states that plaintiff "will provide to [defendant] Segment and fiber identifiers for all Grantee Fibers" and that Grantee Fibers "will not be accepted by [defendant] without Segment and fiber identifiers."  Agmt., Ex. B § 5.

### b. Invoice Dispute Procedures

Section 4 of the Agreement (not Exhibit B) sets forth the terms for the payment of an invoice.  Specifically, "[u]nless otherwise specifically stated in a Network Order, [defendant] will tender payment for undisputed fees within forty-five (45) days of the date that [defendant] receives the invoice."  Agmt. § 4(b). The Agreement also contains terms for disputing an invoice:

> [Defendant] reserves the right to dispute any invoice in good faith.  In the event [defendant] disputes any billing by [plaintiff], [defendant] will (a) pay all charges not disputed, and (b) notify [plaintiff] of the dispute in writing, providing the invoice number and an explanation of the issue in dispute, within forty-five (45) days of receipt of the disputed invoice.

Agmt. § 4(c).  In the event of a billing dispute under Section 4, plaintiff "will advise [defendant] of the results of the completed

-7-

investigation and will make any adjustments mutually agreed to by the parties.  If the parties are unable to resolve the Billing Dispute within such 45-day period, it will be resolved pursuant to Section 16 (Dispute Resolution)."[4]  <u>Id.</u>  Under Section 16, "all disputes, differences of opinion, or controversies arising in connection with this Agreement will first be resolved through good faith negotiation of senior level management personnel of both Parties to arrive at an agreeable resolution."  <u>Id.</u> § 16.  If the parties are still unable to resolve any such dispute "within a reasonable time, not to exceed 30 days," then, subject to the provisions that do not apply here, "the parties shall be free to pursue any right or remedy available to them under applicable law."  <u>Id.</u>

### 3. The Construction Process

After the Agreement and Network Orders were executed on October 31, 2017, plaintiff began obtaining the permits it needed and eventually started installing the fiber optic cable on May 24, 2018.  Pl. 56.1 ¶ 46.  After several delays, construction was

---

[4] Section 4 continues, stating that "[i]f both Parties agree that a disputed amount is a legitimate charge or the charge is determined to be legitimate under Section 16, [defendant] will pay such amount within ten (10) days of such determination."  Agmt. § 4(c).

completed at some point between December 2019 and February 2020, albeit with some repairs ongoing.  Id. ¶ 54; Exs. 25, 33, 40.

## 4. The Fiber Testing Begins

By February 2020, plaintiff, through its contractor, began fiber testing of the Grantee Fiber.  Pl. 56.1 ¶ 56.  At the end of February, plaintiff began sending the test results to defendant on a rolling basis, and defendant, in turn, analyzed those results as they were delivered.  See id. ¶¶ 57-62.

## 5. The Comcast Relationship

Meanwhile, on March 2, 2020, two of defendant's employees discussed how to place defendant's customers, including Comcast, on the Grantee Fiber.[5]  Ex. 47.  Only a few days later, in an email with a subject line "SOF 734 Fiber Testing Package," defendant delivered to Comcast test results on strands of the Grantee Fiber for Span 1, Span 2, and Span 3, which Comcast accepted shortly thereafter.  Ex. 48; see also Ex. 50 (stating that Comcast accepted Span 3 on March 5, 2020 and Span 1 and Span 2 on March 9, 2020).  On March 13, 2020, defendant sent testing files for strands of the

---

[5] A year prior, in March 2019, defendant and its customer, Comcast, executed a Master IRU Agreement, and in May 2019, they executed IRU Order No. 2 (SOF 734), for Comcast's use of strands of the Grantee Fiber on the route, with Comcast obligated to pay defendant an IRU fee and a monthly maintenance fee.  Pl. 56.1 ¶ 53.

Grantee Fiber on Span 4 to Comcast in an email titled, in part, "[t]emp test package," the results of which Comcast accepted the same day. Ex. 49; see also Ex. 50 (stating that Comcast accepted Span 4 results on March 13, 2020). Defendant and Comcast also scheduled time for Comcast to test the Grantee Fiber on March 19, 2020. Ex. 50.

On March 27, 2020, defendant sent a "Notice of Completion" and "Welcome Letter" to Comcast for an IRU on strands of the Grantee Fiber. Pl. 56.1 ¶ 66. The Notice of Completion states that "[t]he [defendant] portion of this Customer Order has now been installed, tested and is functioning in accordance with the testing standards of the service delivery requirements, as required by your agreement with [defendant]." Ex. 52. On the same day, a Comcast employee emailed employees of defendant, "[w]e need you to invoice Comcast for the remaining [balance] on SOF743 [sic]," referring to Comcast's Order No. 2 with defendant. Ex. 77; see also Def. Counter 56.1 ¶ 84 (not disputed that defendant "invoiced and received payment from Comcast for granting an IRU under IRU [Order No.2 (SOF 734)] on two strands of the Grantee Fiber that [defendant] delivered to Comcast in March 2020").

On March 31, 2020, two strands of the Grantee Fiber became available for Comcast's use. Ex. 38 (Response to RFA Nos. 16-21)

-10-

(admitting that "two of the 96 fibers . . . were available to Comcast in March 2020").  As a project manager for defendant Michael Shields ("Shields") testified, at the end of March 2020, both defendant and Comcast had "active traffic on the fiber," meaning that "devices at either side are communicating with one another."  Ex. 5 ("Shields Dep.") 96:11-23.  In other words, as Shields explained, "you have a signal, and the signal is green."  Id. 97:16-17.  Shields did not know exactly "what traffic [Comcast was] passing or how much," but he testified that Comcast was, at minimum, "monitoring [its] links."  Id. 101:13-20.

On April 2, 2020, defendant issued an internal service ticket for a downed, offline fiber on the Grantee Fiber route.  Pl. 56.1 ¶ 70.  Defendant's operations center summarized updates to its "customer" Comcast on efforts to fix the "live fiber."  Id.; Ex. 56.  Throughout April and May 2020, defendant contacted plaintiff to provide certain maintenance support on the Grantee Fiber, Exs. 57-60, including repairing a fiber that was destroyed by gunfire, Exs. 59-60.  On May 14, 2020, defendant generated an internal service ticket observing that "Comcast is seeing a 7dB loss" on the Grantee Fiber.  Pl. 56.1 ¶ 74.

**6. The Final Fiber Testing**

According to defendant's internal notes, on July 10, 2020, defendant "received all the test files," which were "supposed to be the final Certified Test results." Ex. 65 at 4. In an email dated July 10, 2020, defendant further explained that it has "full test results and now organized so we know what is what. We will download all the data and complete a full review over the next week, contractually we have 60 days."[6] Ex. 66. However, on August 18, 2020, defendant rejected the test results and requested certain repairs, remediation, and information. Pl. 56.1 ¶ 81. Accordingly, on or around December 8, 2020, plaintiff delivered a new package of results from the fiber testing. Id. ¶ 82. On December 28, 2020, defendant sent plaintiff a "conditional acceptance" of the results of the fiber testing. Id. ¶ 83.

Following the conditional acceptance, defendant invoiced and received payment from numerous customers, including Comcast, for delivering certain strands of the Grantee Fiber. Id. ¶¶ 84-86. Plaintiff also provided operations and maintenance support on the Grantee Fiber for defendant and its customers. Id. ¶ 87.

---

[6] As noted above, sixty days is the Evaluation Period for reviewing the Certified Results. Agmt., Ex. B § 3.

**7. The Invoice**

On April 23, 2020, months before the defendant's conditional acceptance of the fiber testing on December 28, 2020, plaintiff emailed defendant an invoice of $4,825,822.85, for what it believed represented the "remaining balance of the IRU Fees" (the "Invoice").   Id.  ¶ 88.   Defendant's CEO emailed plaintiff's principal on the same day requesting time to "chat" about "the invoice you sent to our AP department" and stating: "I confirmed with our team that as of today there has been no formal acceptance due to on-going repairs being made in the field by [plaintiff] contractors.  I know the most recent schedule shared with our team is to have these final repairs completed in early May, and final testing results handed over for review and hopeful acceptance thereafter."  Id. ¶ 89.  After this email, there were back-and-forth communications to schedule a call.  Id.  On April 29, 2020, defendant notified plaintiff on a phone call that it would be rejecting the Invoice and disputing the amount charged.  Ex. 93. On June 12, 2020, plaintiff sent a letter to defendant demanding payment of the Invoice.  Ex. 94.

On June 23, 2020, defendant's President and Chief Operating Officer ("COO") sent a letter to plaintiff's principal disputing the Invoice.  Ex. 96.  Referencing the invoice Number, "Invoice

No. 99999," the letter stated that defendant "disputes the invoice in its entirety."  Id.  It thereafter identified the issues in dispute:

> Each of the routes pursuant to IRU Network Orders 1-3 under the Agreement have experienced fiber deficiencies due to poor installation and splicing practices, delayed delivery and lack of functionality.  Pursuant to Paragraph 11 of the same IRU Network Orders, the IRU Fee is to be reduced 5% for every thirty days of delayed delivery.  All routes have experienced significant delays, since the contractual delivery date was January 2019.  Invoice No. 99999 is not accurate since it does not, among other things, reflect the requisite reduction in the IRU Fee for delivery delay.

Id.

On July 24, 2020, plaintiff's principal sent a letter to defendant's COO outlining its positions, namely, that (1) defendant has been "sending traffic" over the Grantee Fiber since March, which is "use for purposes other than testing," thereby constituting acceptance under the Agreement; and (2) the delays in construction were "outside our control."  Ex. 97.  The letter finally requests that, pursuant to Section 16 of the Agreement, senior members of each of the companies meet in good faith to attempt to resolve the matter within the next thirty days.  Id. Defendant has not paid plaintiff any of the invoiced amount.  Pl. 56.1 ¶ 94.

**B.  Procedural History**

On April 7, 2021, plaintiff brought this case in New York state court, asserting several claims against defendant: (1) three breach of contract claims, one for each of the Network Orders; (2) unjust enrichment for providing uncompensated labor, materials, and equipment in constructing the fiber optic route; and (3) breach of contract for "selling and supplying . . . defective, non-conforming and unsuitable Fiber System Materials."  ECF No. 1-1 ("Compl.") ¶¶ 4-36.  On June 25, 2021, defendant removed the case to this Court based on diversity jurisdiction.  See ECF No. 1.  On July 2, 2021, defendant filed an answer and asserted four counterclaims, namely: (1) breach of contract; (2) breach of the maintenance warranty; (3) breach of the implied covenant of good faith and fair dealing; and (4) negligence.  ECF No. 7 ¶¶ 30-57.  On July 21, 2021, plaintiff filed its answer to defendant's counterclaims.  ECF No. 8.

After the Court held a conference with the parties on September 1, 2021, the parties engaged in a lengthy discovery process, which concluded on March 31, 2023.  See ECF No. 49.  On May 30, 2023, both parties filed a pre-motion letter addressing their proposed motions for summary judgment.  See ECF Nos. 53-55.  Defendant sought leave to file a motion for partial summary

-15-

judgment to resolve a question of contract interpretation, namely whether, under the Agreement, plaintiff was required to deliver "Certified Results" to defendant before the "Acceptance Date" in the Agreement could be triggered.  ECF No. 53 at 1.  Plaintiff, for its part, proposed a motion for summary judgment on all of its breach of contract claims and defendant's counterclaims.[7]  ECF No. 55.  On June 2, 2023, the parties each filed letters in opposition to the proposed motions.  ECF Nos. 56-57.  On June 15, 2023, the Court determined that both parties could make their proposed motion but that plaintiff should limit its motion to the first three causes of action (i.e., the breach of contract claims for each of the Network Orders).[8]  ECF No. 58.

On September 8, 2023, plaintiff filed its motion for summary judgment, including a memorandum of law, ECF No. 65 ("Mot."), and a declaration in support of the motion with 97 exhibits, ECF No. 68.[9]  On October 20, 2023, defendant filed its cross-motion for

---

[7] Plaintiff also sought to exclude the reports of defendant's two experts.  ECF No. 55 at 1-3.

[8] The Court determined that motions directed to the expert reports would not be productive at this time.  ECF No. 58.

[9] Also on September 8, 2023, plaintiff submitted a letter to request that six of the exhibits be filed temporarily under seal and/or with redactions to allow defendant time to submit its application for such sealing and redactions.  ECF No. 69.  On September 15, 2023, defendant filed its letter motion to seal and/or redact plaintiff's Exhibits 34, 35, 51, 77, 78, and 79.  ECF No. 71.  On October 3, 2023, the Court granted defendant's application to seal and/or redact.  ECF No. 72.

partial summary judgment, including a memorandum of law, ECF No. 78 ("Opp."), and a declaration in support of the motion with three exhibits, ECF No. 81.   Plaintiff filed a reply brief in further support of its motion and in opposition to defendant's cross-motion on November 3, 2023, ECF No. 82 ("Pl. Reply"), and defendant filed its own reply brief on November 17, 2023, ECF No. 84.

## DISCUSSION

### A. Legal Standards

#### 1. Federal Rule of Civil Procedure 56

Summary judgment is properly granted where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56.  "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'"  Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion," as well as the basis for any absence of material fact in dispute.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  "In moving for summary judgment against a party who will bear the

ultimate burden of proof at trial, the movant must satisfy this burden by pointing to the absence of evidence to support an essential element of the nonmoving party's claim." Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996). Courts must "construe the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016).

If the moving party makes a showing that it is entitled to summary judgment, "[t]hen the onus shifts to the party resisting summary judgment to present evidence sufficient to satisfy every element of the claim." Holcomb v. Iona Coll., 521 F.3d 130, 137 (2d Cir. 2008). The non-moving party "may not merely rest on the allegations or denials of his pleading; rather his response . . . must set forth 'specific facts' demonstrating there is a genuine issue for trial." Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). A "scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." Anderson, 477 U.S. at 252. "If no rational fact finder could find in the non-movant's favor, there is no genuine issue of material fact, and summary judgment is

appropriate." <u>Citizens Bank of Clearwater v. Hunt</u>, 927 F.2d 707, 710 (2d Cir. 1991).

Where, as here, "cross motions for summary judgment are made, the standard is the same as that for individual motions." <u>United Indus. Corp. v. IFTE plc</u>, 293 F. Supp. 2d 296, 299 (S.D.N.Y. 2003). "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." <u>Id.</u>

## 2. General Principles of New York Contract Law

Under New York law, which governs all relevant contracts here, "the initial interpretation of a contract is a matter of law for the court to decide."[10] <u>Int'l Multifoods Corp. v. Com. Union Ins. Co.</u>, 309 F.3d 76, 83 (2d Cir. 2002) (quotations omitted). When a contract is unambiguous, meaning that it is "clear, complete and subject to only one reasonable interpretation," it "must be enforced according to the plain meaning of the language chosen by the contracting parties." <u>Brad H. v. City of New York</u>, 17 N.Y.3d 180, 185 (2011). Moreover, "parties are not free to interpret a contract in a way that frustrates the purpose of that contract or

---

[10] Neither party argues that any of the disputed provisions of the Agreement are ambiguous.

that makes any provision of the contract meaningless." <u>Rex Med.</u>
<u>L.P. V. Angiotech Pharm. (US), Inc.</u>, 754 F. Supp. 2d 616, 624
(S.D.N.Y. 2010).   "The proper interpretation of an unambiguous
contract is a question of law for the court, and a dispute on such
an issue may properly be resolved by summary judgment." <u>Omni</u>
<u>Quartz, Ltd. v. CVS Corp.</u>, 287 F.3d 61, 64 (2d Cir. 2002).

**B. Analysis**

Plaintiff filed a motion for summary judgment on the first
three counts of its complaint -- the breach of contract claims
based on defendant's alleged failure to pay the Invoice.  Defendant
opposed the motion and filed a cross-motion for partial summary
judgment on a question of pure contract interpretation: whether
the parties' Agreement required plaintiff to deliver the Certified
Results of the fiber testing before the Acceptance Date could be
triggered, namely, by defendant's non-testing use of the Grantee
Fibers.  Resolution of this question also resolves the heart of
plaintiff's motion and so we begin with defendant's cross-motion
before turning to the balance of plaintiff's motion.

**1. Defendant's Cross-Motion for Partial Summary Judgment**

Before addressing the question of contract interpretation
raised by defendant's cross-motion, a brief review of the relevant

contractual language is in order.  As discussed above, the majority of the IRU Fees are properly "invoiced" by plaintiff "upon [the] Acceptance Date," e.g., Network Order No. 1 § V(2), which is defined by Exhibit B of the Agreement, Agmt. § (a).  Titled "Fiber Acceptance Procedures," Exhibit B sets forth, in relevant part, the following five numbered sections:

- 1. Acceptance Testing[:] Following the installation of the Grantee Fiber, [plaintfff] shall conduct and complete testing . . . and furnish the actual results of such completed testing to [defendant]. Id., Ex. B. § 1.

- 2. Certified Results and Deliverables[:] Upon completion of the fiber testing . . . , [plaintiff] will present to [defendant] the Deliverables and a fiber acceptance package of certified results (collectively, the "Certified Results") . . . certifying that the Grantee Fiber is installed, fully operational, and performs in accordance with [the Agreement's Specifications.] Id. § 2.

- 3. Evaluation Period[:] [Defendant] will have sixty (60) days from its receipt of the [plaintiff's] Certified Results to review [those results] and provide Acceptance based on [them.] Id. § 3.

- 4. Acceptance Date[:] On the earliest date that [defendant]: (i) provides written notice of its acceptance of the Grantee Fibers; (ii) fails to reject the Certified Results within the Evaluation Period; or (iii) uses the Grantee Fibers for purposes other than the Acceptance Testing, the Certified Results shall be deemed accepted by [defendant] and [plaintiff] shall have no further liability to [defendant] related to Acceptance Testing ("Acceptance Date"). Id. § 4.

- 5. Circuit Identifiers[:] [Plaintiff] will provide to [defendant] Segment and fiber identifiers for all Grantee Fibers. Grantee Fibers will not be accepted by [defendant] without Segment and fiber identifiers. Id. § 5.

As an initial matter, both parties agree that the Acceptance Date, as defined in Section 4 of Exhibit B, is what triggers plaintiff's right to invoice defendant for the remaining IRU Fees. Thus, the parties do not dispute that if defendant properly accepts the Grantee Fibers through one of the three methods set forth in Section 4, plaintiff has the contractual right to invoice defendant for the IRU Fees. Where the parties diverge, however, is on the question of how exactly the Acceptance Date is triggered. Specifically, the parties dispute whether each of the procedural steps contained in Sections 1, 2, and 3 of Exhibit B, particularly delivery of the Certified Results of the fiber testing under Section 2, must be completed before the Acceptance Date can be triggered by defendant's non-testing use of the Grantee Fibers.

Plaintiff asserts that the Acceptance Date can be triggered the moment defendant uses the Grantee Fibers for non-testing purposes, such as commercial purposes, regardless of whether the Certified Results have been delivered. This is because, under plaintiff's reading of the Agreement, by licensing and delivering use of the Grantee Fibers to its customer Comcast, defendant

"use[d] the Grantee Fibers for purposes other than the Acceptance Testing," thereby "deeming" the Certified Results accepted, and triggering the Acceptance Date.  Mot. at 1 (quoting Agmt., Ex. B § 4).  In short, plaintiff claims that because defendant used the Grantee Fibers for commercial purposes, the Acceptance Date was automatically triggered, despite the fact that each procedural step in Exhibit B was not yet completed.  Defendant, on the other hand, argues that Exhibit B sets forth a series of sequential procedures, including delivery of the Certified Results, each of which <u>must</u> be satisfied to trigger the Acceptance Date.  Therefore, according to defendant, because plaintiff had not delivered the Certified Results, the Acceptance Date categorically could not be triggered, even if defendant used the Grantee Fibers for purposes other than fiber testing.

At bottom, the parties' dispute turns on whether Exhibit B sets forth a series of conditions precedent before the Acceptance Date can be triggered by defendant's non-testing use of the Grantee Fibers.[11]  Under New York law, "[a] condition precedent is an act

---

[11] Defendant seems somewhat resistant to analyzing the acceptance procedures through the lens of conditions precedent.  Opp. at 15.  Indeed, in its lead argument, defendant avoids any mention of conditions precedent and instead argues that "the Agreement required [plaintiff] to provide [defendant] with the Certified Results before the Acceptance Date could be triggered."  <u>Id.</u> at 13.  Only after setting forth this argument does defendant argue, in the alternative, that the Agreement contains conditions precedent.  <u>See id.</u> at 15.  However, the Court does not see any daylight between defendant's lead argument and its

or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." Bank of N.Y. Mellon Trust Co., N.A. v. Morgan Stanley Mortg. Cap., Inc., 821 F.3d 297, 305 (2d Cir. 2016) (quotations omitted). "New York respects a presumption that terms of a contract are covenants rather than conditions," Graham v. James, 144 F.3d 229, 237 (2d Cir. 1998), and accordingly, "[c]onditions precedent are not readily assumed," Bank of N.Y. Mellon Trust Co., 821 F.3d at 305. Therefore, "[w]hile specific, talismanic words are not required," conditions precedent must always be "expressed in unmistakable language." Id. (quoting Oppenheimer & Co. v. Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691 (1995)).

With these principles in mind, we conclude that the Agreement does not contain the sort of unambiguous language necessary to establish conditions precedent. To the contrary, the text, structure, and purpose of the Agreement all support plaintiff's position that defendant's non-testing use of the Grantee Fibers triggers the Acceptance Date regardless of whether plaintiff has

---

alternative argument regarding conditions precedent -- either the Agreement requires that certain conditions be satisfied before the Acceptance Date (i.e., conditions precedent) or it does not. The Court can only speculate that defendant's reluctance to address conditions precedent directly is because, as discussed below, conditions precedent can be waived by the parties' conduct.

already delivered the Certified Results.  Beginning with the text, Section 4 of Exhibit B sets forth three alternative methods of triggering the Acceptance Date.  See Agmt., Ex. B § 4.  Two of those methods, including the one at issue here, do not even mention, much less hinge on, plaintiff's delivery of the Certified Results (or any of the testing procedures set forth in Exhibit B).

The first method, which is not applicable here, states that defendant accepts when it "provides written notice of its acceptance of the Grantee Fibers."  Id.  There is plainly nothing in the text that prevents defendant from accepting the Grantee Fibers through written notice at any point during the parties' relationship, including before the Certified Results are delivered (or accepted).  Theoretically, defendant could provide written notice of its acceptance of the Grantee Fibers before fiber testing even begins.  Likewise, under the third method of acceptance, which is the only method relevant here, defendant accepts by "us[ing] the Grantee Fibers for purposes other than the Acceptance Testing." Id.  Again, a straightforward reading of the text demonstrates that defendant could use, and thus accept, the Grantee Fibers at

any time it wishes, regardless of whether the Certified Results have previously been delivered.[12]

By contrast, the only acceptance method that hinges on delivery of the Certified Results does so expressly: under the second method, defendant accepts the Grantee Fibers when it "fails to reject the Certified Results within the Evaluation Period" (i.e., acceptance through silence). Id. As the text shows, the parties made absolutely clear that delivery of the Certified Results is a necessary precondition to defendant's acceptance through silence -- defendant cannot fail to reject the Certified Results if they are never in fact delivered. However, such unambiguous conditional language is noticeably absent in the other two methods of acceptance. This omission is telling because it demonstrates that if the parties intended for all three methods to turn on delivery of the Certified Results, they could have made that condition explicit, as they did for the second method of acceptance, but they chose not to do so. See Bank of N.Y. Mellon Trust Co., 821 F.3d at 309 ("[It is a] well established principle

---

[12] Defendant argues that if the Certified Results were not delivered to defendant before its use of the Grantee Fiber, "then there would be nothing for [defendant] to accept." Opp. at 14. This is incorrect. In fact, what is accepted upon defendant's non-testing use are the Grantee Fibers themselves, and, as discussed below, under those circumstances, the Certified Results are simply "deemed accepted," rather than actually accepted. Agmt., Ex. B § 4.

that, where contract provisions use different language, courts must assume the parties intended different meanings."). Thus, in the clear absence of any express conditional language, the Court refuses to find that delivery of the Certified Results is a condition precedent to acceptance through defendant's non-testing use of the Grantee Fibers.

The language immediately following the three methods of acceptance further supports our conclusion. See E. Cont'l Mining & Dev. Ltd. v. Signet Grp. LLC, 13 Civ. 1930 (KBF), 2015 WL 5707145, at *12 (S.D.N.Y. Sept. 29, 2015) (concluding that the court's contractual interpretation "finds support from the surrounding language of the [agreement]"). Specifically, Section 4 of Exhibit B provides that when defendant accepts in any of the three ways, "the Certified Results shall be deemed accepted by [defendant] and [plaintiff] shall have no further liability to [defendant] related to Acceptance Testing."[13]  Agmt., Ex. B § 4 (emphasis added). As

---

[13] While we focus on the first clause of this provision, which provides for "deemed" acceptance, the second clause regarding "further liability" is also significant because it directly undercuts one of defendant's main arguments. Defendant points out that Subsection 5(b) of the Agreement allows defendant to terminate a Network Order if "the initial Certified Results have not been delivered within ninety (90) days" of the Committed Delivery Date. Opp. at 18 (quoting Agmt. § 5(b)). According to defendant, the "only harmonious reading" of Subsection 5(b) and Exhibit B requires plaintiff to deliver Certified Results before the Acceptance Date can be triggered. Id. Otherwise, it would lead to the "absurd result" that defendant could terminate the Network Order because plaintiff failed to timely deliver Certified Results, while also being deemed to have accepted the Grantee Fiber under Exhibit B. Id. However, as mentioned above, the second clause of the provision in Section 4 of Exhibit contemplates

plaintiff observes, saying that the Certified Results are "deemed accepted" is substantially different than saying (or otherwise requiring) that the results are <u>actually</u> accepted.  Mot. at 17. The word "deem" means to "treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have" -- <u>i.e.</u>, a "legal fiction."  <u>Deem</u>, Black's Law Dictionary (11th ed. 2019).[14]    Thus, reading the provision with this definition, when defendant uses the Grantee Fibers for purposes other than fiber testing, the Certified Results are "treated as if" they were accepted, even if those results were never actually delivered.  In other words, by using the term "deemed" acceptance, the parties agreed to engage in a "legal fiction" that the Certified Results are accepted as soon as defendant uses the Grantee Fibers for purposes other than fiber testing.  Therefore, the surrounding language, namely the Agreement's use of deemed acceptance, lends additional support to our conclusion that

---

and resolves this precise issue.  Under that clause, once defendant accepts the Grantee Fibers through, for example, non-testing use, plaintiff's liabilities "relat[ing] to Acceptance Testing," including delivery of the Certified Results, are fully discharged.  Agmt., Ex. B § 4.  Therefore, if defendant wishes to terminate a Network Order, it must do so <u>before</u> it accepts the Grantee Fibers through one of the methods set forth in Section 4 of Exhibit B.

[14] We rely on the eleventh edition, published in 2019, rather than the twelfth edition, published in 2024, because the eleventh edition is the closest in time to when the parties entered into the Agreement.  <u>See, e.g.</u>, <u>Au New Haven, LLC v. YKK Corp.</u>, 15 Civ. 3411 (GHW), 2022 WL 595951, at *4 (S.D.N.Y. Feb. 26, 2022) (relying on "contemporary dictionary definitions" in construing contractual terms).

delivery of the Certified Results is not a condition precedent to acceptance through non-testing use of the Grantee Fibers.[15]

This conclusion is bolstered by the broader structure of Exhibit B.  To be sure, defendant is correct to point out that the first three sections of Exhibit B use sequential language that tend to support the establishment of conditions precedent.  Opp. at 17 (citing Adler v. Solar Power, Inc., 16 Civ. 1635 (LTS)(GWG), 2018 WL 1626162, at *6 (S.D.N.Y. Mar. 30, 2018) (finding that an employment agreement "unambiguously impose[d] two sequential conditions precedent to the award of Plaintiff's bonus")).  For example, Section 1 of Exhibit B provides that "[f]ollowing the installation of the Grantee Fiber," plaintiff must conduct fiber testing.  Agmt., Ex. B § 1.  Section 2, in turn, states that "[u]pon completion of the fiber testing," plaintiff must deliver

---

[15] In support of its argument for the existence of conditions precedent, defendant cites other surrounding language, namely, Exhibit B, Section 5. Opp. at 15, 18.  That section provides that the "Grantee Fibers will not be accepted by [defendant] without Segment and fiber identifiers."  Agmt., Ex. B § 5. Defendant claims that because the segment and fiber identifiers are part of the Certified Results, defendant cannot accept the Grantee Fibers before receiving those results. Opp. at 15. However, even if the segment and fiber identifiers are part of the Certified Results, and there is reason to doubt they are, Pl. Reply at 6 n.3, defendant's interpretation would lead to an absurd outcome in light of the two methods of acceptance that plainly do not turn on delivery of the Certified Results.  See McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 276 (S.D.N.Y. 2021) (stating under New York law, "a contract should not be interpreted to produce a result that is absurd"). For example, it is nonsensical that defendant could give written acceptance of the Grantee Fibers pursuant to Section 4 of Exhibit B and simultaneously be precluded from accepting pursuant to Section 5.  Therefore, defendant's reliance on Section 5 of Exhibit B is misplaced.

the Certified Results.  Id. § 2.  Finally, Section 3 requires an "Evaluation Period" that expressly depends on prior delivery of the Certified Results, establishing a sequential chain of events, each which must follow the step that precedes it.    Id. § 3. However, that well-defined sequential chain abruptly stops at Section 4, which sets forth the three methods of acceptance. Critically, two of the three methods of acceptance, including non-testing use, do not contain any of the same sequential language used in Sections 1, 2, and 3 and do not otherwise mention the preceding procedural steps.  Thus, the conspicuous absence of such language further demonstrates that acceptance through non-testing use of the Grantee Fibers does not depend in any way on the prior delivery of the Certified Results.

The Agreement's purpose also supports our conclusion.  As the Agreement's second "whereas" clause demonstrates, the central purpose of the parties' contractual relationship is to deliver the Grantee Fiber for defendant's use.  See Agmt. at 1 (stating that plaintiff "intends to build a new route of its Fiber System and transfer equitable title and an indefeasible right of use . . . to certain Fibers in such Route to [defendant]" (emphasis added)). Thus, once defendant begins to use the Grantee Fibers for non-testing objectives, such as by licensing fibers to a paying

customer, the animating purpose of the Agreement has been fulfilled regardless of whether all the fiber testing procedures have been completed.[16]

Finally, our interpretation, unlike defendant's, comports with common sense and avoids a commercially unreasonable outcome. See GPIF-I Equity Co., Ltd. v. HDG Mansur Iv. Servs., Inc., 13 Civ. 547 (CM), 2013 WL 3989041, at *9 (S.D.N.Y. Aug. 1, 2013) ("[T]his construction accords with the rule of common sense (which can be just as important as a rule of grammar in construing a contract)."); McFarlane v. Altice USA, Inc., 524 F. Supp. 3d 264, 277 (S.D.N.Y. 2021) ("New York law . . . provides that a contract should not be interpreted to produce a result that is absurd [or] commercially unreasonable."). Under our interpretation, once defendant uses the Grantee Fibers for any purpose other than fiber testing, the Acceptance Date is triggered and plaintiff may invoice defendant for that use. Simply put, we construe the Agreement as

---

[16] Defendant argues that reading the delivery of Certified Results as a condition precedent "promotes Exhibit B's main purpose: to provide [defendant] with the information and time it needed to confirm that that [Route] was properly constructed." Opp. at 19. However, by using the fibers for commercial purposes before confirming through fiber testing that the Route was properly constructed, defendant acted contrary its own professed purpose of the Agreement. Moreover, defendant's view of "purpose" is far too narrow. While defendant may be correct about the specific purpose of Exhibit B, "courts must interpret [contracts] to effect the general purpose of the contract." Postlewaite v. McGraw-Hill, Inc., 411 F.3d 63, 67 (2d Cir. 2005) (emphasis added). Therefore, we must consider the overarching purpose of the Agreement writ large rather than the purpose of Exhibit B specifically.

requiring defendant to pay for its commercial use of the fibers. By contrast, under defendant's interpretation of the Agreement, defendant could use the Grantee Fiber, and earn revenue from that use, without having to pay for those benefits. Such an outcome is plainly contrary to both business and common sense and is yet another reason we reject defendant's position.[17]

For these reasons, we conclude that the Acceptance Date can be triggered by defendant's non-testing use of the Grantee Fibers whether or not the Certified Results have been delivered. As such, defendant's cross-motion for summary judgment is denied.

### 2. Plaintiff's Motion for Partial Summary Judgment

Having concluded that the Acceptance Date can be triggered by defendant's non-testing use of the Grantee Fibers, we must now decide whether defendant did in fact use the Grantee Fibers for

---

[17] Even if we agreed with defendant that delivery of the Certified Results is a condition precedent, defendant waived that condition. See Roldan v. Second Dev. Servs. Inc., 16 Civ. 2364 (DLI)(PK), 2018 WL 1701938, at *7 (E.D.N.Y. Mar. 30, 2018) ("A party whom a condition precedent benefits may waive such a condition."); see also Walter E. Heller & Co. v. Am. Flyers Airline Corp., 459 F.2d 896, 901 (2d Cir. 1972) ("[I]t is hornbook law that a condition precedent in favor of one of the parties may be waived by that party."). As discussed below, defendant used the Grantee Fibers for non-testing purposes before delivery of the Certified Results (i.e., the purported condition precedent), and therefore can be considered to have waived that condition precedent. This is true even in light of the Agreement's no-waiver provision, see Agmt. § 20, given that "under New York law, it has long been the rule that parties may waive a 'no-waiver' clause," Aeolus Down, Inc. v. Credit Suisse Int'l, 10 Civ. 8293 (LLS), 2011 WL 5570062, at *2 n.3 (S.D.N.Y. Nov. 16, 2011) (quotations omitted).

purposes other than fiber testing and thus trigger the Acceptance Date. Because we answer this in the affirmative, meaning plaintiff had the right to send defendant the Invoice, we must also decide whether defendant is liable to pay the Invoice based on its failure to strictly comply with the Agreement's billing dispute procedures.

### a. Acceptance Date

On the first question, the following undisputed facts show that defendant triggered the Acceptance Date when it began to use the Grantee Fibers for commercial, non-testing purposes in March 2020: (1) a year prior, defendant and Comcast executed a Master IRU Agreement and IRU Order No. 2 (SOF 734) for Comcast's use of strands on the Grantee Fiber, Pl. 56.1 ¶ 53; (2) in March 2020, defendant delivered test results on licensed strands of the Grantee Fiber to Comcast, and Comcast accepted those results, Exs. 47-50; (3) on March 27, 2020, defendant sent Comcast a "Notice of Completion" and "Welcome Letter," Pl. 56.1 ¶ 66; (4) defendant advised Comcast that the Grantee Fiber "has now been installed, tested and is functioning in accordance with the [applicable] testing standards of the service delivery requirements, as required by your agreement with [defendant]," id.; (5) on the same day, a Comcast employee emailed defendant requesting that

-33-

defendant "invoice Comcast for the remaining [balance] on SOF734," Ex. 77; (6) on March 31, 2020, two strands of the Grantee Fiber became available for Comcast's use, Ex. 38; Shields Dep 96:11-23, 97:16-17, 101:13-20; (7) on April 2, 2020, defendant's project manager informed plaintiff that defendant has "active traffic on several fibers on the route as of March 31," Ex. 55; and (8) defendant has since received payment from Comcast under IRU Order No. 2 (SOF 734), Pl. 56.1 ¶ 84. On these facts, we have no trouble concluding that defendant used the Grantee Fiber for non-testing purposes in March 2020, triggering the Acceptance Date and therefore giving plaintiff the contractual right to issue the Invoice.[18]

### b. Invoice Dispute Procedures

Finally, having concluded that plaintiff had the right to issue the Invoice, we now address whether defendant is liable to pay the Invoice despite defendant's attempts to dispute it. To

---

[18] Defendant does not make a concerted effort to refute that it used the Grantee Fiber for commercial purposes in March 2020. However, defendant does argue, albeit fleetingly, that it would be "inequitable" to base its acceptance of the Grantee Fiber on its commercial use of only two of the 96 fibers on the Route. Opp. at 19. As plaintiff points out, defendant cites no authority for the proposition that an "inequitable" result is a cognizable defense to an action at law for damages arising from breach of contract. Pl. Reply at 9 n.4. Moreover, the Agreement provides that defendant accepts when it "uses the Grantee Fibers," not every fiber within them. Agmt., Ex. B § 4. Again, as plaintiff observes, under defendant's reading, it could commercially use all but one of the fibers without accepting and having to pay. Pl. Reply at 9 n.4.

address this issue, some brief context is necessary.  Section 4(c) of the Agreement (not Exhibit B) sets forth specific requirements for defendant to dispute an invoice.  To dispute "any billing" by plaintiff, defendant "will" notify plaintiff (1) "in writing" with (2) "the invoice number" and (3) "an explanation for the issue in dispute," and it must do so (4) "within [45] days of receipt of the disputed invoice."  Agmt. § 4(c).  If there is no resolution within 45 days, the Agreement provides an informal dispute resolution process.  Id. §§ 4(c), 16.

Plaintiff sent defendant the Invoice on April 23, 2020.  Pl. 56.1 ¶ 88.  On the same day, defendant's CEO emailed plaintiff's principal requesting time to "chat" about "the invoice you sent to our AP department."  Id. ¶ 89.  He further stated that "as of today there has been no formal acceptance due to the on-going repairs being made in the field by [plaintiff's] contractors."  Id.  On April 29, 2020, defendant told plaintiff's principal on a phone call that it would be disputing the amount in the Invoice.  Id. ¶ 90.  On June 12, 2020, plaintiff sent defendant a letter demanding payment of the Invoice.  Id. ¶ 91.  On June 23, 2020, defendant's CEO sent a letter to plaintiff disputing the Invoice in a manner consistent with the billing dispute procedures set forth in Section 4(c) of the Agreement.  Id. ¶ 92.

Plaintiff argues that because defendant did not properly dispute the Invoice until June 23, 2020, 61 days after the Invoice was sent, defendant failed to comply with the 45-day written dispute requirement and is now liable to pay the full amount of the Invoice. See Mot. at 24. Defendant does not dispute that it failed to adhere strictly to the dispute resolution requirements. Instead, defendants contends that it "substantially complied" with those requirements, which it claims is sufficient under New York law to satisfy the contractual requirements. See Opp. at 26-29. For the following reasons, we reject defendant's position and find that plaintiff is entitled to summary judgment.[19]

Courts applying New York law have repeatedly found parties contractually liable for failing to strictly comply with invoice dispute procedures. In one such case, the court granted summary judgment on plaintiff's breach of contract claim because it demonstrated that "defendant did not dispute [the] invoices in the manner provided in the contract." Covanta Hudson Valley Renewable Energy, LLC v. Dutchess Cnty. Res. Recovery Agency, 2016 WL

_____

[19] Plaintiff also argues, in the alternative, that defendant is liable to pay the full amount of the Invoice on an account stated theory. See Mot. at 25 n.2. Defendant counters that plaintiff's account stated claim should be rejected because it was not asserted in plaintiff's complaint. See Opp. at 29-31. However, because defendant is liable under traditional breach of contract, we need not address plaintiff's attempt to raise an account stated claim.

11188565, at *2 (N.Y. Sup. Ct. Apr. 12, 2016).[20]   In rejecting defendant's argument that plaintiff had "actual notice" of its objections to the invoices, the court reasoned that the parties were "two highly sophisticated business entities [that] negotiated a comprehensive service agreement providing for the exact method in which objections to invoices were to be processed." Id. at *4. Because the "contract [was] clear and unambiguous on its face," the court refused to "disregard the parties' contract, a requirement if the defendant's argument were to be accepted." Id.

Other courts construing New York law have adopted similar reasoning.  See, e.g., MCI Worldcom Commc'ns., Inc. v. LD Wholsesale, Inc., 161 F. App'x 31, 32 (2d Cir. 2005) (holding that the district court "properly found" defendant liable for breach of contract because it "failed to dispute" the invoices in the manner that the parties' contract "clearly provide[d]"); McFayden Consulting Grp., Inc. v. Puritan's Pride, Inc., 928 N.Y.S.2d 87, 88 (App. Div. 2011) (affirming district court's grant of summary judgment on plaintiff's breach of contract claim where defendant

---

[20] Defendant's attempt to distinguish Covanta on the basis that the defendant failed to object to invoices until it answered the amended complaint is unavailing. See Opp. at 27 n.17. The case is instructive not because of when defendant objected to the invoices but because of how defendant objected to them -- namely, by failing to strictly adhere to the procedures set forth in the parties' agreement.

"did not dispute [the] invoices in the manner provided in the contract and did not pay the amounts due" (citing <u>Castle Oil Corp. v. Bokhari</u>, 861 N.Y.S.2d 730 (App. Div. 2008))); <u>Perl v. Smith Barney Inc.</u>, 646 N.Y.S.2d 678, 679 (App. Div. 1996) (dismissing complaint because plaintiff "made no effort to rebut [defendant's] showing . . . that plaintiff failed to object in writing within ten days of the imposition of the [fee]" as was required under the parties' contract).[21]

Applying these principles here, we cannot excuse defendant's failure to adhere strictly to the unambiguous dispute resolution procedures that were negotiated and agreed upon by two highly sophisticated corporations.  The parties' Agreement leaves no doubt that the 45-day written notice requirement is indeed mandatory.  As noted above, it provides that defendant "<u>will</u> . . . notify [plaintiff] of the dispute in writing, providing the invoice number and an explanation of the issue in dispute" and do so "within forty five (45) days of receipt of the disputed invoice." Agmt. § 4(c); <u>cf. Purnell v. Lord</u>, 952 F.2d 679, 684 (2d Cir. 1992) (describing the words "shall," "will," and "must" as "language of an unmistakably mandatory character").  Because defendant failed

---

[21] Defendant's attempts to distinguish these cases on factual grounds are unpersuasive because those distinctions, to the extent they exist, do not undermine the fundamental legal principle that makes these cases instructive.

to strictly adhere to those requirements, which it effectively concedes, defendant is contractually obligated to pay the full amount of the Invoice.[22]

## CONCLUSION

For the foregoing reasons, the Court (1) denies defendant's cross-motion for partial summary judgment; and (2) grants plaintiff's motion for summary judgment on its first three claims for breach of contract. Apart from this ruling, several claims still remain, namely: (1) plaintiff's quantum meruit claim based on the labor and materials it allegedly provided to defendant; (2) plaintiff's contract claim based on defendant's alleged defective fiber materials; and (3) defendant's counterclaims. If the parties cannot resolve these outstanding claims, they are directed to file a proposed schedule for their resolution with the Court within forty-five (45) days of this order. Finally, the Court respectfully directs the Clerk of Court to terminate the motions pending at ECF Nos. 63 and 76.

---

[22] The parties also dispute whether a force majeure event occurred and altered the amount owed by defendant. See Mot. at 27-31; Opp. 31-35. However, because the Court concludes that defendant owes the full amount contained in the Invoice, we need not address the force majeure issue.

**SO ORDERED.**

Dated:    New York, New York
          August 23, 2024

_____
NAOMI REICE BUCHWALD
UNITED STATES DISTRICT JUDGE